## Weir, Appellant, *v.* Washington Trust Company.

*Mortgage — Assignment — Principal and agent — Signature — Fraud—Findings of fact—Review—Two innocent parties.*

1. The findings of fact of a chancellor that the signature of the assignor to an assignment of a mortgage is genuine, will not be reversed on appeal, where there is sufficient credible evidence to support the findings and there is no manifest error.

2. Where an owner of a portion of a mortgage executes an assignment thereof to a trust company and delivers it to another person, and such person, after having had it recorded, takes the recorder's certificate, the original mortgage and certificate of no defense to the trust company, and receives the money due, and embezzles it, the assignor cannot thereafter claim that the payment by the trust company was improper, on the ground that the person to whom it was paid was the company's agent. Such person was not the agent of the company, and, as the assignor's acts made the embezzlement possible, the loss must fall upon him.

Argued Oct. 11, 1918. Appeal, No. 156, Oct. T., 1918, by M. R. Weir, from decree of C. P. Washington Co., No. 2507, in equity dismissing bill in equity in case of M. R. Weir v. Washington Trust Company, Isaac W. Semans, C. E. Lenhart, J. E. Hustead and Joseph F. Guffey. Before STEWART, MOSCHZISKER, FRAZER, SIMPSON and FOX, JJ. Affirmed.

Bill in equity to compel reassignment of portion of mortgage and an accounting. Before SWEARINGEN, J. of the 5th Judicial District, specially presiding.

From the record it appeared that the plaintiff was the owner of a portion of a mortgage made by Isaac W. Semans to Frank M. Courson, to secure payment of $12,000, which was dated June 1, 1906, and duly recorded. There appears of record an assignment of the unpaid balance of this mortgage, including the plaintiff's interest, to the Washington Trust Company, dated June 1, 1911. The plaintiff averred that he had no knowledge of this assignment until October, 1915, that he did not

make it, and that he had never received any consideration for the alleged transfer of his interest. He prayed that the Washington Trust Company be ordered to re-assign his share of the mortgage to him with interest, and that the maker and his successors be required to account. The defendants denied the averments of the bill relative to the assignment. They alleged that the plaintiff did execute the assignment and that, at the time of its delivery to the Washington Trust Company, it paid to his agent, H. R. Myers, the full amount of his share, and that Myers was duly authorized to receive the same.

In dismissing the plaintiff's bill the learned judge presiding delivered the following opinion, in which may be found a fuller statement of the facts:

SWEARINGEN, J.:

The important question of fact in this case is whether or not the plaintiff executed the assignment of the mortgage as found in Findings of Fact 3, 4 and 8. He positively denied that he had executed the assignment or had ever seen it until some years afterwards, and he denied that the signature thereto is his. He denied that he had ever received the money, and there is no evidence that he actually did. He complained that the Washington Trust Company did not inquire of him whether he had authorized Myers to receive the money. On the other hand, the defendants introduced evidence which they contend clearly shows that the plaintiff did execute the assignment, as the same appears, and they aver that, even though the plaintiff may have been defrauded, his acts enabled Myers to commit the wrong—the Washington Trust Company having omitted no duty imposed upon it by the law.

The first consideration is the nature of the plaintiff's own testimony. The defendants argue that his testimony is unreliable, particularly in view of his statements relative to his signature. When he was shown a receipt on the margin of the record of the mortgage, which he undoubtedly signed, and was asked whether or

not his signature thereto was genuine, he replied, "That looks like my handwrite," and then the following occurred:

"Q. Is that your handwriting? A. Well, I can't say. Q. Well, what is your best judgment A. Well, it looks a little like my handwriting, but I can't——. Q. Mr. Weir, do you know your handwriting when you see it? A. No, sir, I don't. Q. You don't? A. I don't."

And throughout his cross-examination, when confronted with other papers which he did sign, substantially the same colloquy would occur; he declined to positively identify his signature unless he first knew what the "thing was about." Mr. Weir is a man of mature years and of considerable experience in business. It may be that he is unable to recognize his signature, unless he were first fully informed of all the facts and circumstances of writing his name. But this is somewhat unusual. Certainly testimony of that character is not of the highest value, when the question at issue is the genuineness of the witness's own signature. Another circumstance is this: Mr. Weir testified that he learned of improper conduct on the part of Myers in 1915, and that he instituted an investigation and discovered the assignment. He and his attorney then visited the Washington Trust Company and asked to see the original paper, which was shown them. Mr. Baird testified that, after they had examined it, he (Baird) said, "What is the matter with it," and Mr. Weir replied he had no recollection of getting the $6,000. He (Baird) said, "Why, you signed the paper, didn't you?" He (Weir) said, "Why, it looks like my signature, but I don't remember getting the $6,000." This, it will be observed, is different from Mr. Weir's testimony at the trial. He did, however, deny that he made the statements attributed to him by Mr. Baird, and also testified that his attorney did the talking. However, the attorney was not called as a witness at the trial.

On their side, the defendants called several men who were familiar with Mr. Weir's writing. They also called bankers who had frequently passed his checks. These all testified that the plaintiff's signature to the assignment is genuine. A number of checks, notes, and other writings, which admittedly Mr. Weir had signed, were introduced for comparison. And then James A. Magill, the notary public, was called. His recollection of the circumstances was not clear, which was not strange considering that he had been performing such official duties for many years. Naturally he had to rely largely upon the book which he kept, showing what services he had rendered, the dates, and the compensation received. The entries were somewhat meagre. But they do indicate that the one, relative to the acknowledgment of this assignment, was not made after the event. It appears in the proper place and in the order of date, during the year 1911. It is as follows:

"June 1.   Viola Ray Agnew et al (3)

                    "Ack. Asst Mfg.          1.00"

The entry immediately preceding is of May 31st, and the one immediately succeeding is of June 2d. Mr. Magill explained that the character "(3)" meant that three persons had acknowledged the instrument. Like characters were found throughout the book in other entries. He said his ordinary charge was twenty-five cents, but when he had to go to the residence of a party his charge was fifty cents, and because he was obliged to go to Mr. Weir's house his total charge was $1, fifty cents for Mr. Weir's acknowledgment and twenty-five cents each for the other two assignors. Mr. Magill could not remember the taking of the acknowledgments. He did recollect being at the plaintiff's house, and but once only, and that was for the purpose of "fixing a paper." He said that the plaintiff and he went into the house at the side door, and after finishing the business he (Magill) went out by the front door. It is true he does not remember taking the completed assignment away. But

he must have done so, because it was next found in the possession of Myers, when he presented it to the Washington Trust Company, and neither of the assignors gave it to Myers. In our judgment, the testimony of Mr. Magill cannot be disregarded, when he declared that the plaintiff signed and acknowledged the assignment in his presence. The very purpose of the assignment was to obtain the money afterwards. The usual course was to execute it and then it was to be delivered and the money paid. Mr. Weir did considerable business with Myers, knew him very well, and had full confidence in him until in the fall of 1915. We do not doubt that the paper was executed in the manner therein set forth and was then given to Magill to be by him handed to Myers, for the purpose of transferring the title to the mortgage and receiving the money therefor. Considering all the testimony and circumstances and comparing the plaintiff's signature which is in dispute with signatures admittedly his, we are obliged to conclude that Mr. Weir did sign and acknowledge the assignment of the mortgage, as is claimed by the defendants.

The plaintiff admitted that he had delivered the mortgage to H. R. Myers early in May, 1911. He explained that Myers had deceived him into leaving the mortgage, and he never did get it. But there is no pretense that the Washington Trust Company had any notice of Myers' misconduct, or had knowledge of any facts that would have led it to believe Myers' possession of the mortgage was fraudulent.

H. R. Myers was declared a lunatic by decree entered December 31, 1915, at No. 2396, of the Common Pleas of Washington County, in Equity, and he has since been confined in an insane asylum. Consequently his testimony could not be taken.

Having found that the plaintiff did execute and deliver the assignment of the mortgage, what are the legal consequences? Myers had the assignment recorded as directed, after the trust company had examined it. He

then took the recorder's receipt, the original mortgage and the certificate of no defense to the trust company. He thus had all the papers necessary to complete the transaction, and they were all genuine. They surely justified the trust company in accepting them as a valid transfer of the mortgage. But, says the plaintiff, the trust company paid the money to Myers without inquiring of his authority to receive it, and this was negligence. We cannot agree with that proposition. Myers was never the agent of the trust company for any purpose. He was the agent of the assignors, if they executed the assignment as we have found they did. When Myers brought the mortgage and the assignment in the manner shown, to the trust company, it was warranted in paying him the money. It might have been paid in cash, and payment by draft to Myers' order "was not different in effect." So it was held where the faithless agent to some extent represented both parties, which in this case Myers did not: Pepper v. Cairns, 133 Pa. 114.

This is a hard case. Either the trust company or the plaintiff must suffer. Undoubtedly the trust company acted innocently. Myers embezzled the plaintiff's share of the money which he received. He probably was able to conceal his dereliction for over four years. But if he lulled the plaintiff to sleep by paying him interest from time to time, the trust company was equally thrown off its guard by Mr. Semans paying it the interest as the same accrued. By executing and delivering the assignment, the plaintiff put it within the power of Myers to commit the fraud, and therefore the plaintiff must bear the loss.

From the foregoing we reach the following conclusions of law:

1. It is not disputed that a court of equity has jurisdiction to determine the issues raised by the pleadings in this case.

2. Under the facts found, the Washington Trust Company was justified in regarding H. R. Myers as the agent

of the assignors of the mortgage (including the plaintiff) for the purpose of receiving payment of the consideration, and there was no negligence on the part of the trust company in giving him in exchange for the mortgage and the assignment a draft for the money.

3. Even though Myers did subsequently embezzle plaintiff's share of the money, the plaintiff's acts, as stated in the findings of fact, made it possible for Myers to commit the wrong and the loss must fall upon the plaintiff.

4. Under the facts found, the plaintiff is not entitled to the relief for which he has prayed, and the bill should be dismissed at his costs.

Let a decree be drawn and submitted in accordance with the findings of fact and conclusions of law, unless exceptions hereto be filed within the time prescribed by the rules in equity.

*Error assigned* was decree dismissing the bill.

*Clyde W. Hufford* and *Samuel Amspoker,* for appellant.

*Winfield McIlvaine* and *Norman E. Clark,* for appellee.

PER CURIAM, January 4, 1919:

The decree dismissing plaintiff's bill is affirmed on the opinion of Judge SWEARINGEN.